Please, the Court. My name is John Basinger and I represent Appellant EPRO E-Commerce Ltd. Three months ago, this Court issued an opinion in Virginia Properties LLC v. T-Mobile Northeast LLC. In that opinion, based on the U.S. Supreme Court's opinion in Goodyear Tire & Rubber v. Hager, cited in our reply brief, which came out between our first brief and our reply brief, this Court vacated and remanded a sanctions order for a determination of the amount of costs and attorneys' fees that should be awarded solely to compensate appellees for the failure of that party to make timely disclosures. Virginia Properties applied Goodyear to require a vacatur and remand of a district court's order, imposing sanctions that were, in part, punitive. So too here. At Special Appendix 83, the district court acknowledged that When you say that these are punitive, as I understand it, the amount was calculated directly in terms of the attorneys' fees that were incurred by the other side in pursuing the successful motion with respect to spoliation, or at least the partially successful motion, and in taking additional depositions that were required because of the misconduct of your client. Is that wrong? The amounts were calculated from plaintiff's attorneys' fees. So if the amount of the award is the amount of the fees that were expended as a result of the misconduct, where is the punitive component of the sanction? The punitive component is because not all the fees were incurred because of the misconduct. Virginia Properties follows on Goodyear. I'm sorry. I know that case. I'd like to know about this case, and I'd like you to explain to me the statement that you just made, that not all the fees were incurred as a result of the misconduct. That's not something from Virginia Properties. That's something from this record. So please explain. I'm happy to hear it. Thank you, Your Honor. Yes. The difference is that a good portion, and the district court has the obligation to suss out what is what here, was not incurred because of the delayed production, which was substantially complete by early September 2013, before the second round of depositions. The majority of the fees here are for the forensic investigation. Yes. Exactly. I did not understand that this was compensation for delayed production, but that it was compensation for the necessity of undertaking a forensic examination because of what was learned in the depositions. So am I wrong about that? Your Honor, so Magistrate Dollinger's order that permitted the forensic investigation said in sum, it appears that there has been some loss of non-transactional data, what we've referred to as unstructured ESI, that is, e-mails, Word files that could be stored on a computer or server, things like that. He said, and Magistrate Dollinger said in that order, however, CLPSH has not shown me yet that there is anything other than, at the base of this case, an amount in controversy in excess of the three-figure range, that is, less than $1,000 in U.S. profits, which is what is demonstrated here. CLPSH chose to go on an incredibly expansive discovery foray. That was not caused by the failure to provide the deposition. CLPSH said, we think there's more out there, and was pounding the table in front of Magistrate Dollinger and said, let us go find it. The ultimate result here. He ordered them to, he permitted them to do that? He permitted them to, yes. The costs that they're seeking recovery on are the costs that were incurred in doing the search that Magistrate Judge Dollinger authorized. And it's in two components, am I correct? One is attorney's fees, and one is the cost of the computer experts. That's correct, Your Honor. So it's directly attributable to compliance with Judge Dollinger's order? It was. So CLPSH expended costs in terms of what Magistrate Dollinger had allowed them to do. That does not make those fees and costs caused by the deposition. Why did he allow them to do it? He allowed them to do it because CLPSH asserted that there was more to the case than the damages in the three-figure range that we said. CLPSH asserted again and again to the district court that they had evidence that there were more sales. Ultimately, there was no such evidence. And Judge Broderick, even in the orders appealed from, found that the global gross sales were $7,889. Here we have a sanctions order for 2.7. But was there not a reason to believe that the defendants had failed to disclose certain information and indeed had perhaps destroyed some information? Is that not what the basis for this extensive investigation was? In other words, as I understand, you just said this was because the plaintiffs said there are big damages. And the magistrate judge said, fine, go ahead and have this forensic investigation. I thought there was a step in the middle, that the plaintiffs said that we think there are big damages. And one reason we think that is because there is evidence of spoliation. They said that. But the ultimate findings here, looking through, again, separating the structured data, which even, again, even in Judge Broderick's decisions, deals with generally the amount in controversy from the unstructured, which here affects willfulness. And that's expressly in the order. Now, I hear that. I mean, I understand that. Is that the basic point here, that we should divide this into two components, one as to which there was a finding of spoliation, one as to which there was not, and require the district court to disaggregate the attorney's fees as to what was the cost of investigating the structured electronic information as to which, in the end, there was no finding of misconduct? Correct. There was a delay, but that delay was remedied before the second set of depositions. But I guess I'm still puzzled about that because you don't know until it's done whether there is, in the end, a finding of going to be a finding of spoliation ex ante. Why is it unreasonable, based on what was known at that time, for the magistrate judge to permit this inquiry? In other words, if your guys are destroying one set of evidence, why should the inquiry be limited to, oh, just look at this, do a forensic examination of that, and don't go any further to see what else they might have destroyed? To be clear, we're not appealing Magistrate Dollinger's order allowing the inspection. We're appealing the idea that an unsuccessful inspection, when Klipsch was on notice correctly and had multiple sets of cooperating documents, that this was a $7,000 case. If a party destroys some evidence and the magistrate judge says, gee, as a result of that, I think we should look into seeing whether they destroyed anything else, the other side undertakes that inquiry at its own risk, because if it turns out that only some things were destroyed and not others, that any expenses that was related to looking at the other category of information cannot be recovered, even though the whole problem is that your guys are spoliating from the beginning. Why is that a reasonable way to conduct the discovery process? In sum, because it is fundamentally unreasonable to spend $2.7 million on a claim that the district judge initially and Magistrate Dollinger had said, this is a sub-$10,000 claim, particularly when there were multiple Rule 68 settlement offers, including a permanent injunction. This was a case solely about money and a case of the case. Excuse me. Was one of those Rule 68 offers ultimately for $400,000? Yes, Your Honor. For this three-figure case, you're saying? Yes, Your Honor. At some point, you have to try to stop the bleeding. This is an effort to escape the Kafkaesque world of discovery being pursued for discovery's end. If we look at this case in general, Your Honor, and this goes to the issue of what success was there on this odyssey to search for things, Klipsch said before they went out to inspect, we have plenty of evidence of willfulness, which is what's in the unstructured data. They already had more than 40,000 e-mails and loose e-documents on a case worth in the three-figure range. And all they did at the end is come back and say, all right, we've gathered up 700,000 plus more files and e-documents. We've also had a months-long forensic investigation. And Klipsch said, well, the evidence that we bothered to look at in those 700,000 documents is cumulative of what we had before. There was no material change. You know, in a document production, the lawyer doing the production is happy to produce 100,000 documents if he or she can only withhold three. That's because unless you have thorough production, you don't know whether you're seeing the documents that are variously called smoking guns or, you know, live or hot or whatever. So the fact that a large number of documents are produced doesn't mean that all the documents have been produced or that all of the most sensitive and important documents, the most important documents have been produced. That's true. But having been given so many documents in the beginning and so much opportunity to plumb e-pros, individual computers, and systems, at this point, Your Honor, it strikes me as reasonable that the plaintiff should have been required to look at that document and say, something here suggests that something is missing that would actually change the game a bit. And there's nothing in there. As for the Goodyear principle, the district court said that virtually everything that was being assessed was in connection with the misconduct or possible spoliation. You aren't really saying that if there's small, insubstantial deviations, you want that all redone. Your argument is that there's a whole seven-figure component here that shouldn't be charged at all. Yes, Your Honor. I agree. Thank you, Your Honor. Thank you. We'll hear rebuttal. We'll hear you on rebuttal. May it please the Court, Roxanne Ealings for appellee, appellant Klipsch. I'd like to, unless you have further questions on the last issue, I'd like to talk about the court's finding with the unstructured ESI findings. Actually, I do have a question. Okay. Because if the court was satisfied that no misconduct or concealment or spoliation adhered in the structured ESI, then presumably that's the entire universe, there was then disclosed the entire universe of the number of infringing headphones that were sold. Yes, Your Honor. And so what was the purpose of a seven-figure investigation halfway around the world? Well, first of all, you have to take a step back. And it wasn't just that documents were provided late, but we'd already flown to Hong Kong, taken deposition, found out a litigation hold was never put in place. And when one was put in place, it was orally only. There were a lot of what the court found That leaves a lot of room for spoliation. I agree with you. Yes. But the question is, if the question is how many of these headphones with the impermissible mark were sold, why couldn't that just have been determined categorically from the structured ESI? Well, I don't believe that the structured ESI, I believe that that was also spoliated. There's no finding as to that. I understand that, but I think there are errors of law on the part of the district court in that finding. But even if You're justifying the forensic investigation on the basis of the fact that you don't agree No. with respect to the structured ESI. No, I'm sorry. That's part of it. But actually, it's because of the defendant's actions that caused the numbers to go up. And what the court found is, even when our experts went over there, and there was a lot of discussion before about what would be produced, who would produce, what would be produced. It was agreed to by the parties. When we got over there, there was a lot of delay, and that's what the court found. The information was wiped. I get it that it was the other, and you're saying that, you know, if we believe the court. And the court even said we could still, there hasn't been a finding of what those damages are. There hasn't been a hearing on this yet, right? I understand that we're a little bit hampered by the fact that this is an interlocutory appeal so that everybody can still, both sides can still make assertions about what amounts might be proven at a trial. But that is where we are, and I have not seen any evidence that you've uncovered larger quantities of infringing sales than what has been in the case from the beginning. Even assuming that's so, we would not have known that until we went over and took that. So is that the essence of your position then, that once the defendants have been shown to have spoliated some information and to have failed to put a litigation hold on, then it becomes reasonable for the court to permit you to undertake an investigation because you don't know. All the information they've provided has thus been rendered unreliable, and you need to undertake that investigation because of their wrongdoing. Is that the basic point? Yes, and this court found a lot of spoliation. This wasn't just a small amount. It just happens to be the case, though, that the lot of spoliation was with respect to things like e-mails that are not the direct evidence of sales records that you were looking for. And it turns out that the district court found no spoliation with respect to the so-called structured information. I don't know why it's called that, by the way, but this is not the place to include that. Basically, we're talking about the sales records is what was of most interest. And as to that, there was a finding of no spoliation. Right. And the court, when it looked at the unstructured, the e-mails and all that, it went through the proper – it looked at the preponderance of the evidence. They looked at the party having control over the evidence, had an obligation to preserve, the records were destroyed, and that they destroyed it. So they went through that. When they did it – when they went with a sales database, which a sales database is different. Okay. It's different than e-mails. When you go in and you look at a laptop or you can find – if you look, and it was very sophisticated here, it was very tough, but you can look and you can find where things were changed. When you have a sales database, it's meant to change. Right. So the only way that you can tell if something is missing from before is if there is historical data. And what happened is the court said, well, you didn't find anything in this sales database that was any different than what the defendants themselves gave you four years ago. It could be something different. Isn't the fact that the sales database may change daily a function of the fact that it is cumulative? It is not. So if 100 offending headphones were sold in January and 100 were sold in February, the opening account in March would be 200 have been sold. Well, if no one had touched the sales database. If no one had touched the sales database. When was the finding made that the sales – the structured ESI had not been tampered with? Was that before or after? After. That's after the forensic team was sent to Hong Kong. That's correct. But I believe what the court did was sort of bootstrap itself. It said, well, there isn't – I don't see anything here, but the problem is with these sales databases, when there are changes, you're not going to see it. Well, yes, but is there some argument here? I thought I found in your brief some argument that there were backup – in the normal course, backup files are made on a weekly or monthly basis or something like that, and those were missing? Those were destroyed every 30 days. Those were destroyed every 30 days. Even though they had an obligation. So that your argument – now, I take this to be largely a factual argument that the district court – was made to the district court and the district court didn't accept, but is it that your argument is that – to take Judge Jacobs' example, in January there's 100 sold, and so there's a backup file that says January 100 sold, and then in February there are more sales, and then if somebody altered that, you wouldn't be able to go back, and if the backup file is destroyed, you wouldn't be able to go back and check whether the actual cumulated information was retained or whether somebody messed with it in the interim. That's correct. Is that the argument? Yes, that's correct. And where I think the court erred as a matter of law, though, it's not just factual, is that he states EPRO had a legal obligation to preserve its ESI in its dynamic databases, and the only way to do that is to preserve those historic backups. That's the only way. But there is a factual finding that cuts against you here because the court found that the backup files were created as a backup for some kind of disaster or emergency that might afflict the company, and if that is so, then as a matter of law they didn't have a duty. I would like to address that. I think that's very important, and I do believe that is another error of law. Under Zubilacki, which the court talked about, a disaster backup tape, one that you are not able to access, it's determined by the medium of the backup. In Zubilacki, that was a tape. These were not tapes. There was no... Whether or not it's accessible or inaccessible, that burden would have been on EPRO to show. There was no showing of that. They just called them backup just because they're backup. The various mediums in which data is collected may change over time. Yes. As I understand it, the principle is that if the purpose of the backup is to assure that in the event of a disaster, a fire at headquarters, a flood, or whatever, that there's an off-site duplicate, that I'm not sure why it matters what form it's in. Well, I would urge you to read Zubilacki v. UBS Warburg, Southern District of New York of 2003. It goes into detail. That is also... There's similar reason under Federal Rule 26b-2b. Judge Scheinlin enumerated five categories of sources of ESI, active online data, near-line data, offline storage and archives, and backup tapes and erased, fragmented, or damaged data. Those last two are the two that she talks about, the tapes. It is the storage. Zubilacki says that. Rule 26 follows that. It's not about whether it's backup. But it seems to me that there's a question of fact from which there follows, depending how you decide it, an issue of law. And it seems to me it was found, as a matter of fact, that the purpose of this backup tape was for insurance against disaster. But it's not the purpose. It's still searchable. It's searchable. So a tape is not searchable. Whatever they made it, they are not allowed to destroy it once the litigation is in place because it could be a valuable source of information. That's correct. And it's unique. It's a unique source. It is different. Could I ask... I'm going to ask Mr. Basinger the same thing. As I look at this case, accepting the factual findings of the district court as to where there was spoliation and where there was not, there is a rather simple legal issue. And that is this. If it is reasonable, because one side has spoliated evidence or there's a reasonable basis for thinking so and has obstructed the discovery, if it is reasonable, as a result of that, to undertake a large investigation, is the sanction that is applied for the original misconduct that leads to that investigation is the amount of the reasonable sanction determined by what it was reasonable to allow as an investigation ex ante or by the results that come ex post? That it turns out that the only spoliation, give or take, was more or less what led to the investigation, not anything new. Only they had that knowledge. We didn't have that knowledge. No, I'm not asking about anybody's knowledge. I'm asking a legal question. The legal question is, is the reasonable sanction for the misconduct that led to the investigation based appropriately on what was the reasonable scope of an investigation to undertake or on the outcome that ultimately is determined as to whether there was or was not a greater degree of spoliation than was shown in the first place? That's the legal question. I know what each side's position is on that. My simple question is, do you have any case or any authority that we should look to to tell us the answer to that question? And I'm going to ask him the same thing. Or is that a kind of question of first impression that we need to deal with? Um, I... Whether it's on the reasonable... I think the cases that we cited in our brief would support that it is on what you would assume would be the reasonable, um... the reasonable scope of that investigation. I mean, I don't know how... even just... common sense, right? Yeah, because otherwise, if you get to the end and it turns out to have been an unsuccessful expedition, you're still saying the reason for the unsuccessful expedition was that they engaged in misconduct in the first place. If the expedition was reasonable based on that, then they appropriately should be made to pay that large sanction for the misconduct in the first place. Right, I don't think you can play those games. They're the ones who know. And if they had been up front to begin with. That's the logic of your position. That would be the logic of mine. I believe the case law we cited would support that. Thank you. Mr. Basinger? And Mr. Basinger, the logic of your position is if it was only a little bit of misconduct in the first place and then it turns out that that's all that's ever uncovered, then ex post, you shouldn't be required to pay for all the other inquiries that were done. I think that's true. And again, particularly we have to look at here the proportionality. But does that depend on the ex post or are you really having to argue that the original authorization must have been disproportionate in the first place? Because my problem is, if it was reasonable based on what the showing was in the first place to permit the other side to do this big investigation, why are they undertaking that at their own risk? If it's reasonable to think that based on the misconduct that was shown in the first place that this is a reasonable thing to do, then why aren't you appropriately sanctioned for the original showing of misconduct let alone whatever the ultimate finding is that, yeah, there was really misconduct there. Why isn't that a reasonable basis for all the things that they did? It's, again, Magistrate Dollinger allowed them to go out and look, saying, you haven't showed me this is more than a three-figure case. I'm going to let you go look. Of course they haven't shown that yet. The issue is whether there is a reasonable basis to think based on the misconduct that was committed, that maybe there's a lot more here. And the answer here, Your Honor, is no. There was no reasonable basis to think, and let me tell you why. So you really are challenging if not the authorization to do it, at least any idea that that whole investigation stemmed from a reasonable extrapolation from misconduct in the first place. Correct, Your Honor. Before Klipsch ever went out on this part for which the order says they're getting their fees and costs, they had, as I've mentioned, 42,000 roughly emails, e-docs, other things collected by FTI consulting on EPRO's behalf. Among those documents were dozens of real-time, forensically datable sales reports. So when we talk about a backup, what these are are weekly sales reports. Again, if, as Klipsch has wished to speculate throughout this entire case, there were a lot more sales of these things, they would have been in those reports. Those reports provide another layer of cumulative information as to the sales reports. Why couldn't the magistrate assume that if there had been spoliation, erasure, and all kinds of skullduggery in the case that the scheduled ESI, which you're talking about, may not be reliable? But again, we have, Your Honor, this goes back, this is like being able to take a snapshot on a sales report from before the case was filed in some cases, because you can go back and forensically date these emails and these are I think Exhibits 89 and 90, they're in the record. You can forensically date these emails with these Excel-type sales reports attached. So this is electronic, forensically datable. You can look at those and say, all right, we see that the reports of sales shown on this electronic piece of evidence that we know was generated before the case was ever filed and we can match that up against what we see here and what else is in the We can match that up against what's in the live databases. We can match that up against the claims. Your argument is that there was no basis for the conduct of this Hong Kong forensic analysis, rather than, as I heard you arguing earlier, that the disproportion of it defeats the reasonableness of it. Both arguments are there, Your Honor, because it may have been reasonable and we actually stood up in court, I will acknowledge and Klipsch proposed in its motion that there be a court-appointed investigator and we said again, looking for a way to end this Kafkaesque nightmare for EPRO where it's a lawyer's case, it's run so far out ahead of what was well-known by this time to be the underlying value of the case and EPRO accepted the idea that if a court-appointed expert were to come in and do a targeted investigation of the structured data to verify or debunk what had been reported, that could have been appropriate, but that's not a $2.7 million operation. That's a possibly a $200,000 operation. And the $200,000 would have been grossly disproportionate to what you're talking about as the middle three but not nearly so bad as $2.7 million of course. Is there any factual basis? I take it what you're really asking us for has to be that we send it back to the district court to undertake some sort of further factual inquiry as to exactly what? Because there's no finding by the district judge that a $200,000 investigation would have been adequate or anything like that. So what is it that our instruction to the district judge should be? One, the district court has to suss out what is really directly due to spoliation and not due to a desire just to keep investigating, and that's under the Virginia Properties case. What do you mean by... The district judge did what the district judge thought was correct. If we're going to say what he did was wrong we've got to give him some rather specific instructions. So what do you mean by due to the spoliation? Right. I mean what was actually necessary to investigate and remedy the spoliation versus what is a desire because again before the sanctions period Is it going to be your position that looking at conducting an extensive investigation into the structured ESI was not reasonable in a reasonable response to the spoliation? Yes, Your Honor. The extent of the structured investigation was excessive as well as the extent of the unstructured investigation. The second thing I would ask, Your Honor, to direct the court is as we put in our briefing... How is any of that different from what the judge actually did? What is the judge going to ask about? What kind of experts are going to come in and testify about what in order to make a finding as to what was a reasonable response to the original showing? I think there is an inquiry into how far did Klipsch reasonably have to go before it came in and misrepresented ex parte to the district judge? No, no, no. We don't need the rhetoric. I'm trying to get at how do you make this fact finding? It has nothing to do with whether somebody made an ex parte application that was then promptly revealed to you and then the rest of the inquiry was conducted unnoticed the way it should be. That's not the point. I want to understand what kind of... If I'm the district judge here, what kind of facts am I to look at? Or are we just to give some vague instruction this seems like it was too much kind of So go do it over again. Tell me what the district judge is supposed to ask. I think the district judge is supposed to ask what was really reasonably necessary here. And that is both under the Virginia Properties case and under the Barfield factors. What really is the success here? Isn't that the ruling that the judge made? And if it's wrong, then you have to establish that it was wrong under some definable standard. And I We talked about what actually was gained through this whole thing other than to keep asking questions. That says at the end of the day it didn't work. What I'm trying to get at and what I think we've been discussing was was it reasonable in the first place? What is a reasonable inquiry to undertake in response to the original showing? And your argument is I guess you still have an argument. It doesn't persuade me I don't think, but ok. You have an argument that if at the end it's just more money than the results ex post vindicate they can't be awarded that kind of sanction. But the issue we're talking about now is what was reasonable ex ante for them to inquire into and that isn't determined by what they found. That's determined by what it was reasonable to look for in the first place. I think there's some of that Right and that's why I stressed your honor what they had before they ever went out on this odyssey. They did have ample information their own investigator is disclosed in the record, bought a dozen different copies ultimately of these things all through disguised purchases and the first clue for Klipsch should have been 100% every one of those records was disclosed in the materials that EPRO handed over right away and these were detailed sales records that had been organized When they could not have known which were the undercover purchases Correct If all of the undercover purchases are in there that would suggest that maybe everything is in there Correct Can I ask you a question? Is it in the record as to what your fees were and the fees of your experts? Measuring the reasonableness of the Klipsch's fees? I don't believe that our fees I don't believe that our ultimate fees at the time of the hearing are in. I think there is in the record some reference to fees incurred by EPRO statements at hearings and things like that earlier Thank you